Dietz v. Bielitsky

*Donald W. Van Artsdalen*, for plaintiffs.
*James Fitzcharles, 3rd*, for defendant.

FULLAM, J. May 1, 1964.—Plaintiffs hired the Louis Traiman Auction Company to dispose of their 160-acre farm estate in Lower Makefield Township by sale at public auction. The Traiman firm caused a "preliminary plan" of the property to be prepared, subdividing it into 25 lots or parcels. After extensive advertising, the auction sale was held on May 27, 1961, and defendant became the purchaser of three of the parcels. The transactions were never consummated, because the "preliminary plan" subdividing the farm for purposes of the auction sale did not fully comply with township subdivision regulations, and no final plan of the proposed subdivision was ever submitted to or approved by the township authorities.

Plaintiffs attempted to rescind the agreements, and tendered the return of the deposit money, but defendant refused to accept it. Ultimately, plaintiffs brought the present action to quiet title, seeking cancellation of the three agreements of sale held by defendant. Defendant filed a counterclaim seeking damages for loss of bargain.

The case was listed for jury trial. However, it is to be noted that the relief sought by plaintiffs in the original action is of the sort which, prior to the adoption of Pennsylvania Rule of Civil Procedure 1061, would have been obtainable by a bill in equity *quia timet*, and therefore does not require a jury trial. See note of Procedural Rules Committee to Pa. R. C. P. 1061; Pa. R. C. P. 128 (f); Goodrich-Amram Commentary, section 1061 (a).

The trial judge ruled that there were no issues to submit to the jury. In the original action, a decree was entered in favor of plaintiffs, directing the cancellation of the agreements of sale upon payment by plaintiffs to defendant of the deposit money and out-of-

pocket expenses. On the counterclaim, the trial judge entered what was in effect a compulsory nonsuit. The case is now before the court for disposition of defendant's motion for new trial and motion to take off the nonsuit.

The basic question is whether or not the evidence affords an adequate basis for the award of damages to defendant for loss of his bargain. It is settled law in this Commonwealth that such damages may be visited upon a defaulting vendor if his failure to convey was unjustified, but not otherwise; and that the test is whether bad faith or the equivalent has been shown: Seidlek v. Bradley, 293 Pa. 379 (1928); Kargiatly v. Provident Trust Co., 338 Pa. 358 (1940); Delvitto v. Schiavo, 370 Pa. 299, 304 (1952); Frey v. Nakles, 380 Pa. 616, 622, 623 (1955); Altman v. Arata, 129 Pa. Superior Ct. 229 (1937); Craven Estate, 169 Pa. Superior Ct. 94 (1951); Britsch v. Allebach, 2 Bucks 248 (1952).

In the reported cases, bad faith has been found to exist where the refusal to convey was principally motivated by a desire on the part of the vendor to obtain better terms from the purchaser or a third party: Frey v. Nakles, Delvitto v. Schiavo, and Seidlek v. Bradley, supra; where the vendor wilfully breached the agreement by selling to someone else first, Craven Estate, supra; or where the vendor falsely represented that he was the owner of the property, when in fact title was held by someone else, Smith v. Krause, 64 D. & C. 451 (1948). On the other hand, it has been held that a vendor who did not in fact own the property is not chargeable with bad faith because of inability to make title, if the true facts were disclosed to the purchaser at the time of the agreement of sale: Altman v. Arata, supra. See also Stephens v. Barnes, 30 Pa. Superior Ct. 127, 134 (1906).

The authoritative decisions make it clear that each

case must be decided on its own facts. It is therefore necessary that we review in some detail the factual background, which is entirely undisputed.

Plaintiffs resided at the property in question from 1939 to 1958. During some of the earlier years, plaintiff Walter Dietz was a member of the Planning Commission of Lower Makefield Township. Prior to his retirement, Mr. Dietz was president of a nationally known manufacturing firm. Since 1958, plaintiffs have resided in Florida. Early in 1960, plaintiffs listed their farm property for sale with a local real estate broker, Wynne James, Jr., who is also a member of the bar. Eventually, Mr. James suggested that the property be sold at auction, whereupon, in January of 1961, the Traiman firm was employed for that purpose. Under date of January 9, 1961, a written "listing agreement" was entered into between plaintiffs as seller and the Traiman firm, which included the following provisions:

". . . Seller hereby lists the said property (or properties) for sale with Louis Traiman Auction Company, (hereinafter called Auction Company), to be sold by Auction Company at absolute auction on or before the 27th day of May next, unless the time shall be extended by the mutual agreement of the parties. At its discretion, Auction Company may also offer the said property (or properties) as an entirety but will subdivide into parcels, and the Seller authorizes Auction Company to obtain surveys for this purpose and charge the cost thereof to Seller. Auction Company is authorized to hire a tent, chairs, public address system and other equipment, if required in its opinion, and charge the cost thereof to Seller. The said property (or properties) shall be sold at absolute auction to the highest bidder without limit, favor or reserve.

"Seller further authorizes Auction Company to spend the sum of $2,000.00 on such advertising of the

sale as Auction Company may feel is desirable, leaving it to the sole judgment of Auction Company as to what media of advertising should be used and in what quantities, except that Seller shall not be liable above the amount specified. This sum, and the survey and equipment costs if required, shall be payable by Seller upon demand of Auction Company.

"Seller hereby nominates, constitutes and appoints Auction Company the Seller's attorney-in-fact for and in Seller's place and stead, to make, execute and deliver an agreement of sale for said property (or properties) to the highest bidder upon Auction Company's usual form ... upon the following terms: ...."

The agreement then specifies a number of terms of the proposed agreements of sale, including

"Title shall be good and marketable, free and clear of all liens and encumbrances (but subject to all existing restrictions), and such as will be insured at regular rates by any responsible title insurance company, otherwise Buyer shall be repaid by Seller the deposit paid on account together with the expenses he may have been put to for title searches.

"Seller agrees to deliver to Buyer, his heirs or assigns, a Deed for said property (or properties) in accordance with this agreement and the agreement of sale to be delivered by Auction Company".

It is to be noted that this agreement does not authorize the auction company to obligate plaintiffs to pay for the construction of streets nor to pay any other expenses which might be necessary to comply with township subdivision regulations.

The auction firm had a "preliminary plan" prepared, dated March 10, 1961, dividing the farm into 25 parcels. Generally speaking, this plan provides for 20 small lots along the existing public road frontages, and divides the balance of the farm into five tracts ranging in size from 22 acres to 32 acres each. At four

locations, the front lots are spaced so as to allow access to the interior tracts; and there are laid out across the various interior tracts what were apparently intended, although not designated, as proposed streets, indicated by dotted lines, some 50 feet wide and some 60 feet wide.

On April 18, 1961, after some preliminary correspondence, this plan was submitted to the township planning commission for approval; the planning commission made certain recommendations to the township supervisors; and on May 5, 1961, the township manager sent the following letter to plaintiffs' agent, Mr. James:

"Dear Mr. James:

At the regular meeting of the Lower Makefield Township Board of Supervisors held Monday, May 1, 1961, the Spring Cress Farm plan was given preliminary approval subject to the following conditions:

1. That Quarry Road and Lindenhurst Road be shown with the ultimate right-of-way, of 80'.

2. That the road coming in from Lindenhurst Road and paralleling Quarry Road be shown with a right-of-way of 60'.

3. That the Township Engineer approve the plan for drainage purposes.

4. That the proposed streets be properly named.

5. That the proposed building set-back lines for each road be shown.

6. That the Bucks County Health Department on-lot feasibility report be received.

When the final plan is submitted, it will be necessary to submit a filing fee of $25.00 and $1.00 per lot, and also a performance bond guaranteeing the construction of all streets, drainage facilities, etc.

Yours very truly,
William H. Struwe
Township Manager"

No final plan was submitted for approval. On May 27, 1961, the auction sale took place. The three agreements of sale involved in the present controversy are identical in form, except for parcel number and price. Each designates plaintiffs as seller "by Louis Traiman Auction Company, Agent constituted by written agreement" and describes the premises to be conveyed as

"Parcel No. [—] on Preliminary Plan of 'Spring Cress Farm', property of Walter Dietz, prepared by George R. Nevells, Surveyor, Perkasie, Pa. dated March 10, 1961 and reference to said plan is hereby made for the full and complete description thereof."

Each agreement contains the following pertinent provisions:

". . . free and clear of all liens and encumbrances, except as may be otherwise herein stated, but to be subject to all existing restrictions, easements, recorded agreements, and covenants, zoning regulations, ordinances, statutes and regulations of any constituted public authority, now in force or which may be passed prior to final settlement . . .

"Title shall be good and marketable and such as will be insured at regular rates by Commonwealth Land Title Insurance Company, otherwise the Buyer shall be repaid the deposit money paid on account, without interest, and he shall also be reimbursed for the expenses he may have been put to for title searches and thereupon the Seller's liability hereunder shall absolutely cease.

"The Seller shall not be liable for any work done or ordered to be done after the date hereof by any municipal or other public authority upon or about the said premises, and Buyer agrees to take title subject to any lien therefor and to any notice issued as a result thereof.

". . . and the Buyer agrees that neither the Seller nor the LOUIS TRAIMAN AUCTION CO. shall be

responsible or accountable for . . . any agreement, condition, representation or stipulation, oral or written, not specifically set forth herein.

"This agreement contains the entire agreement between the parties; no prior agreement or representation of any kind, and no contemporaneous or subsequent oral agreement or representation and no dealing between the parties or custom shall be permitted to contradict, vary or add to the terms hereof.

"The Buyers, their heirs and assigns, of Parcels No. 4 to 13, inclusive, shown on said plan, shall have the free and common right, liberty and privilege of the 60 foot strip laid out on the rear of said lots and the 50 foot strip laid out on the easterly side of Lot No. 13 for the purpose of ingress, egress and regress, from and to Lindenhurst Road and Quarry Road.

"The Buyers, their heirs and assigns, of Parcels No. 16 to 19, inclusive, shown on said plan, shall have the free and common right, liberty and privilege of the 60 foot strip laid out on the westerly side of Lot No. 16, the 50 foot strip laid out on the rear of said lots and the 50 foot strip laid out on the easterly side of Lot No. 19 for the purpose of ingress, egress and regress from and to Quarry Road."

Plaintiffs remained in Florida during this entire period, and were not present at the auction sale. They first learned that the transaction had run afoul of the township subdivision regulations several weeks after the sale, when they made inquiry as to why their agents had not submitted deeds to them for signature. Upon learning of the difficulty, plaintiffs immediately obtained independent legal advice and sought to rescind.

We believe the trial judge was correct in holding that, under all of the circumstances, plaintiffs' refusal to convey was justified. Even a cursory examination

of the agreements of sale makes it clear that liability of plaintiffs to take further action to comply with the subdivision regulations was not within the contemplation of the parties at the time. Any attempt by plaintiffs to convey in accordance with the agreements as drawn would have been illegal, and would have subjected the plaintiffs to severe penalties, quasi-criminal in nature.

If plaintiffs had submitted a final plan, incorporating the changes required by the township; if the township engineer had approved the drainage; and if the county department of health had favorably reported the feasibility of on-site sewage disposal, then the plaintiffs could have avoided violating the law by posting security for the construction of "streets, drainage facilities, etc." But it is altogether too clear for argument that, in such event, the transaction would have been entirely different from the transaction contemplated by both sides when the agreements were signed, and that defendant would have received a great deal more than he bargained for.

Defendant freely admitted that this was not his first venture into real estate speculation and development; in fact, in the transactions presently under discussion, defendant was acting on behalf of a syndicate of experienced real estate developers. Defendant's own testimony does not even attempt to suggest that, at the time the agreements of sale were executed, he thought he was buying a completed subdivision, with street improvements, etc., paid for by someone else. Any such suggestion would have been utterly without merit, in view of the language of the agreements themselves, and in view of the entire tenor of all of the advertising, brochures, etc., preceding the sale.

A vendor of real estate may be liable in damages for unjustified refusal to convey in accordance with his agreement; but where his agreement is itself impos-

sible of fulfillment because it violates township ordinance requirements, the vendor is not chargeable with bad faith for refusing to enter into a different agreement and carry it out.

There is a further reason for refusing to allow defendant to recover on his counterclaim. The agreements sued upon were not signed by plaintiffs, but by the auction company as "agent constituted by written agreement." Defendant was thus put on notice that he was dealing with an agent, and that the agent's authority was set forth in a writing. If the agreements of sale should be construed as imposing upon the vendors the duty of complying with the township subdivision regulations, at whatever cost, then the agreements of sale were to that extent beyond the agent's authority, and the plaintiffs would not be bound by any such provision. See Restatement of the Law of Agency, 2d, sec. 164; also section 34(d) comment (g) and section 34(e) comment (h).

We are unable to find any evidence of bad faith in the conduct of plaintiffs after the auction sale. Negotiations between the parties and discussions with the township officials in an attempt to work out some mutually satisfactory arrangement which would comply with the subdivision requirements began early in July and extended at least until mid-October of 1961. [In the interim, all of the other 22 agreements of sale appear to have been rescinded; at least, none of them was carried out.] We readily agree with defendant that these subsequent negotiations and attempted agreements made it unnecessary for defendant to comply literally with the requirements of the agreements of sale making it the duty of defendant to submit deeds for signature by July 22, 1961; but they also, it seems to us, indicate exactly the opposite of bad faith.

It is of course difficult to understand the attitude of the auction company and the real estate agent in pro-

ceeding to hold the auction sale after notice of the township's requirements and without further consultation with their principals; but since it is clear from the evidence that that was not plaintiffs' idea, that fact provides no support for a charge of bad faith against plaintiffs.

In view of the foregoing conclusions, it is unnecessary to discuss the other reasons set forth in defendant's motions. None of the excluded evidence bears upon the basic issue of whether plaintiffs' refusal to convey was justified.

## Order

And now, May 1, 1964, for the reasons set forth in the foregoing opinion defendant's motions for a new trial, and motion to remove the compulsory nonsuit as to the counterclaim, are hereby overruled and dismissed.

Counsel for plaintiffs are directed to submit a form of final decree, for entry pursuant to Pa. R. C. P. 1066 (b).

And now, July 15, 1964, pursuant to the opinion and order of court entered May 1, 1964, in the above entitled action, the court hereby enters the following:

## Final Decree

1. Conditioned upon plaintiffs paying or tendering payment to defendant of the sum of $7,895, plaintiffs' title to the premises hereinafter described is valid and indefeasibly vested in plaintiffs against any right, title, lien, claim or interest of defendant, and defendant is forever hereafter barred from asserting any right, title, lien, claim or interest in said premises inconsistent with plaintiffs' title as set forth in the Complaint in the Action. The said premises are described as follows: [See description in file] Tract of land situated in Lower Makefield Township;

2. Conditioned upon plaintiffs paying or tendering payment to defendant of the sum of $7,895, the three agreements of sale dated May 27, 1961, entered into between plaintiffs, as sellers and defendant as buyer, copies of which are attached to plaintiffs' complaint marked exhibits "C", "D", and "E", respectively, for the sale of certain portions of the said premises hereinbefore described are hereby declared to be null and void; and the same are hereby cancelled and defendant, William Bielitsky, is directed thereupon forthwith to mark all such agreements or copies thereof in his possession "cancelled," and thereupon forthwith to surrender and deliver the same to plaintiffs.